# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| **Cory Trboyevich,** | Civ. No. 11-2911 (SRN/AJB) |
| Plaintiff, | |
| | **REPORT AND RECOMMENDATION** |
| **v.** | |
| **Michael J. Astrue,**<br>**Commissioner of Social Security**, | |
| Defendant. | |

_____

Sean M. Quinn, Esq., Falsani, Balmer, Peterson, Quinn & Beyer, 1200 Alworth Building, 306 West Superior St., Duluth, MN 55802-1800, for Plaintiff.

David W. Fuller, Asst. United States Attorney, 600 United States Courthouse, 300 South 4th Street, Minneapolis, MN 55415, for the Commissioner.

_____

ARTHUR J. BOYLAN, United States Chief Magistrate Judge

The matter is before this Court, United States Chief Magistrate Judge Arthur J. Boylan, for a report and recommendation to the District Court on the parties' cross-motions for summary judgment.  *See* 28 U.S.C. § 636(b)(1) and Local Rule 72.1.  This Court has jurisdiction under 42 U.S.C. § 405(g).  Based on the reasoning set forth below, this Court recommends that Plaintiff's motion for summary judgment [Docket No. 8] be denied and Defendant's motion for summary judgment [Docket No. 14] be granted.

I.    **FACTUAL AND PROCEDURAL BACKGROUND**

A.    <u>Procedural History</u>

Plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") on August 22, 2008, alleging disability beginning July 25, 2006, based on back and neck injury and depression.  (Tr. 763-73, 817.)[1]  His applications were denied initially and upon reconsideration.  (Tr. 709-13, 718-20.)   Plaintiff requested a hearing before an administrative law judge, and the hearing was held on September 15, 2010, before Administrative Law ("ALJ") Leonard A. Nelson.  (Tr. 728-29, 1364-86.)  The ALJ did not reopen the decision on Plaintiff's prior applications.  (Tr. 682.)  The ALJ issued a partially favorable decision on January 3, 2011, finding disability for the closed period of June 15, 2008 through August 12, 2010, but not before or after that date.  (Tr. 682-94.)  On September 9, 2011, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner.  (Tr. 652-56.) *See* 20 C.F.R. §§ 404.981, 416.1481.  On October 3, 2011, Plaintiff sought review from this Court.  The parties then filed cross-motions for summary judgment.

B.    <u>Factual Background</u>

Because Plaintiff's prior disability applications were not reopened, the relevant time period begins on July 25, 2006.  The Court reviewed the entire administrative record, but the summary of the medical records is focused on the period of the alleged onset date through June 15, 2008, the date Plaintiff was found disabled, and also the months leading up to the end of the disability period, August 12, 2010.  As background, in 2002 Plaintiff

---

[1] The Court will cite the Administrative Record in this matter, Docket No. 5, as "Tr."

was a laborer and forklift operator at Potlatch, having worked there for six years. (Tr. 152.) On May 26, 2002, he was involved in a work accident when he failed to duck to avoid walking into a steel beam. (Tr. 1231.)[2] Plaintiff was wearing a hard hat, but it flew off his head on impact. (Tr. 1231.) Plaintiff's primary physician, Dr. John Fedje-Johnston, diagnosed a whiplash type injury. (Tr. 357.) Dr. Fedje-Johnston referred Plaintiff to Dr. Matthew Eckman, a physical medicine and rehabilitation specialist, who diagnosed cervical strain with C5-6 disc and ligament change, myofascial pain and muscle tension headaches. (Tr. 389.) Plaintiff became embroiled in workers' compensation litigation, and after much conservative treatment failed to reduce his neck pain and headaches, he was approved for three-level cervical discectomy and fusion, performed on October 16, 2008. (Tr. 1231-42, 1243-48.)

Just after the alleged disability onset date, in August 2006, Plaintiff was taking Wellbutrin for depression and asked Dr. Fedje-Johnston for an increase in the dose. (Tr. 1199.) Plaintiff's other medications included Oxycontin 30 mg, twice daily, Percocet, 90 tablets per month, and Prilosec. (*Id.*) When Plaintiff saw Dr. Eckman later that month, he reported having headaches three or four times a week, and once a month his headache was severe enough to go to an emergency room for an injection. (Tr. 602-03.) After switching from Effexor to Wellbutrin for depression, his mood was relatively good. (*Id.*) Plaintiff took Klonopin to help him sleep, but only if he had not slept for a few nights. (*Id.*) He stayed up until 4:00 a.m. watching television or doing puzzles, but still woke up between 7:00 and 9:00 a.m. (*Id.*) On examination, Plaintiff held his neck stiffly, but there was no

---

[2] Coincidentally, when the accident occurred, Plaintiff had recently returned to work after arbitrating a dispute with his employer. (Tr. 415.)

evidence of radiculopathy or myelopathy.[3]  (*Id.*)  On September 16, 2006, Dr. Eckman opined that Plaintiff was permanently and totally disabled from his work injury on May 26, 2002.  (Tr. 600.)   His disability was based on his neck pain with degenerative discs and emotional difficulties arising from the impact of the injury on his life.  (Tr. 599-600.)

Plaintiff underwent a consultative psychological evaluation with Dr. James Huber on October 13, 2006.  (Tr. 920-24.)  Plaintiff's symptoms were pain, depression and anxiety. (Tr. 920.)  When he took it easy, his pain intensity was three or four on a scale of one to ten.  (*Id.*)  Wellbutrin was effective for his mood but Lexapro was causing side effects, and Plaintiff wanted a change in the antidepressant.  (*Id.*)  Plaintiff said he was only qualified for labor, and he wanted to go to school because he needed a job where he could stand, sit or lie down as needed.  (*Id.*)  The longest he held a job was as a bartender for eight years.  (Tr. 921.)

Plaintiff described his daily routine as follows.  He woke up between 8:00 and 9:00 a.m. to take pain medication, and then stayed in bed for an hour watching television.  (*Id.*) He got dressed and sometimes ate, then sat or laid down to watch television.  (*Id.*)  Some days he went out to walk, but it was painful.  (*Id.*)  He visited his girlfriend two or three times a week, did laundry once a week, and sometimes went to the library to use the Internet for an hour.  (*Id.*)  He performed light physical chores at home for one hour maximum.  (*Id.*) He spent half of the afternoon lying down, and watched television at night.  (*Id.*)  He walked two blocks to get the mail, and grocery shopped once a month.  (*Id.*)  He also visited a neighbor once a week, and his son stayed with him on weekends.  (Tr. 922.)

---

[3] Myelopathy means disorder of the spinal cord.  *Stedman's Medical Dictionary* ("*Stedman's*") 1171 (27th ed. 2000).

During the interview, Plaintiff sat with a stiff neck and continually braced against pain. (*Id.*) He was pleasant and cooperative, did not look nervous, and gave good effort. (*Id.*) Plaintiff said he worried a lot, his energy was low, and his mood was getting a little better, but three or four days a week he was so depressed he stayed in bed. (*Id.*) He could focus but his short-term memory was poor. (*Id.*) His crying spells were reduced by taking Wellbutrin. (Tr. 923.) He only slept five hours at night. (*Id.*)

Plaintiff performed well in cognitive testing with the exception of difficulty recalling four items from a list. (Tr. 922.) Dr. Huber estimated Plaintiff's intelligence as average to high average. (Tr. 923.) He diagnosed adjustment disorder with mixed anxiety and depressed mood, and assessed a GAF score of 55.[4] (*Id.*) Dr. Huber opined that Plaintiff could understand and follow directions but might need frequent reminders; he could sustain attention and concentration but with poor recall; psychologically, he could carry out tasks with reasonable persistence and pace but he was markedly compromised by chronic pain; he would be able to respond appropriately to coworkers and supervisors; and without pain, he could tolerate stress in the workplace. (*Id.*)

On December 1, 2006, Plaintiff told Dr. Fedje-Johnston that Lyrica helped his pain with no ill side effects, and Klonopin helped him sleep. (Tr. 1194.) Dr. Fedje-Johnston noted that overall Plaintiff's medications were working quite well. (Tr. 1194.) In February

---

[3] The Global Assessment of Functioning "GAF" is a scale of 0 to 100, used by mental health clinicians to rate the social, occupational and psychological functioning of their clients. *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM-IV-tr*") 32 (American Psychiatric Assoc. 4th ed. text rev. 2000). Scores between 51 and 60 indicate moderate symptoms or moderate difficulty in social, occupational or school functioning. *Id.* at 34. Scores between 41-50 indicate serious symptoms or any serious impairment in social, occupational or school functioning. *Id.*

2007, Plaintiff told Dr. Fedje-Johnston he settled his workers' compensation case and started school, taking four classes. (Tr. 1193.) He had some difficulty concentrating due to the medications he was taking, and pain sometimes limited his ability to go to class. (*Id.*) The next month, Plaintiff was doing fairly well in school but had dropped some courses because he was fatigued. (Tr. 1192.) Dr. Fedje-Johnston noted Lyrica might have been causing the fatigue, and Plaintiff was doing better since discontinuing it. (*Id.*) In June 2007, Plaintiff was hoping to restart school, although he had some difficulties in the past. (Tr. 1189.) Plaintiff told Dr. Fedje-Johnston he remained "relatively functional." (*Id.*)

Plaintiff was referred to Dr. Darrell C. Dykes at the Twin Cities Spine Center for surgical evaluation. (Tr. 939-41.) On August 1, 2007, Plaintiff had some tenderness and reduced neck range of motion, but his examination was otherwise normal. (Tr. 940.) Dr. Dykes reviewed Plaintiff's 2005 MRI and discogram, and took new x-rays of Plaintiff's cervical spine. (*Id.*) He diagnosed multilevel cervical disc degeneration at C3-4, C4-5, C5-6, with disc protrusion at C3-4 and C5-6. (*Id.*) Later that month, Dr. Fedje-Johnston noted Plaintiff was stable but limited in his activities, and he could not work due to pain and inability to stand for long periods. (Tr. 1186.)

Plaintiff had an MRI of his cervical spine on September 4, 2007. (Tr. 1156.) The MRI showed a narrowing thecal sac due to vertebral body spurring and disc protrusion, with mild foramen narrowing at C3-4 and C5-6. (*Id.*) C4-5, C6-7 and C7-T1 were unremarkable. (*Id.*) The MRI also showed a Chiari I malformation.[5] (*Id.*) Plaintiff wanted

---

[4] A Chiari I malformation is a structural defect in the cerebellum, the part of the brain that controls balance. It involves the extension of the cerebellar tonsils into the foramen magnum without involving the brain stem. Type 1 is the most common type of malformation and may not cause symptoms.

surgery because his quality of life was affected by pain.  (Tr. 942.)  Smoking was a risk factor for nonunion, and Plaintiff was encouraged to quit.  (*Id.*)  Dr. Fedje-Johnston kept Plaintiff off work for neck strain pending surgery.  (Tr. 931.)

On November 6, 2007, Plaintiff underwent an independent medical evaluation with Dr. Terry Hood, related to his workers' compensation claim.  (Tr. 1231-42.)  Dr. Hood reviewed Plaintiff's medical history in detail.  (*Id.*)  On examination, Plaintiff was tender in the neck muscles with mild limitation in his range of motion, but there was no evidence of spasms.  (*Id.*)  Dr. Hood opined that the mechanism of Plaintiff's injury did not explain his development of discogenic pain at three levels of the cervical spine, and that considerable embellishment of symptomatology could be secondary to depression or resentment of Plaintiff's former employer.  (Tr. 1240.)  Dr. Hood found that the discogram was suspect because it showed concordant pain at C4-5, which was normal by MRI.  (Tr. 1241.)  If C4-5 was injured in 2002, Dr. Hood would have expected to see degenerative changes in the September 2007 MRI.  (*Id.*)  Dr. Hood also opined that worsening at C3-4 and C5-6 could be explained by the intervening five years and because Plaintiff was overweight and a smoker.  (*Id.*)  Dr. Hood opined that mechanical neck and muscle pain with mild degenerative disc disease would not benefit from fusion.  (Tr. 1241-42.)  He believed Plaintiff should be in a chronic pain program to wean off narcotics, and should use a muscle relaxant, like Klonopin, that did not have drug abuse potentional.  (Tr. 1242.)  However, workers' compensation court approved Plaintiff for three-level fusion.  (Tr. 932-34.)

Plaintiff underwent a psychological evaluation for depression on December 27, 2007,

---

http://www.ninds.nih.gov/disorders/chiari/detail_chiari.htm

with Dr. Jeffrey Toonstra. (Tr. 926-29.) Plaintiff had received a workers' compensation settlement, but said he was unable to pay for psychological services. (Tr. 926.) Plaintiff reported difficulty coping with frustration, frequent tearfulness, and suicidal thoughts without a plan. (*Id.*) However, his children "kept him sane," and he had an infant grandson who sometimes lived with him. (Tr. 926-27.)

Plaintiff no longer had a girlfriend. (Tr. 927.) His son lived with him half-time. (*Id.*) He took his son to sports events and practices including hockey and basketball. (*Id.*) Plaintiff used to play hockey but did not skate as much any more due to back pain. (*Id.*) Plaintiff spent his days laying down and doing some chores. (*Id.*) He felt stuck in the house unable to do much. (*Id.*) In the past, he got along well with coworkers. (*Id.*) He tried to go to school but pain made him quit. (*Id.*) He also had side effects from medications including heartburn, irritability and anger. (Tr. 928.) During the interview, Plaintiff was teary-eyed and talkative; he moved slowly; he was euthymic at times; he had no obvious cognitive defects; and he was alert and oriented with good memory. (*Id.*) Dr. Toonstra diagnosed major depressive disorder, single episode, moderate, and assessed a GAF score of 55. (*Id.*)

Dr. Toonstra opined:

> [Plaintiff's] mental capacities to understand, remember and follow instructions appear to be hampered by low energy and impaired concentration secondary to pain issues. He appears to have varying difficulty with attention and concentration. He would not appear to have difficulty carrying out work-like tasks with reasonable persistence or pace if he were not in pain. His ability to respond appropriately to brief and superficial contact with coworkers and supervisors seems to be a strength as he is quite personable. He would likely be able to tolerate stress and pressure in entry-level work places if he were able to manage his pain issues.

(Tr. 928-29.)

When Plaintiff saw Dr. Fedje-Johnston on February 27, 2008, he reported that his pain increased over the last months and asked for an increase in medication. (Tr. 986.) Plaintiff spent most of the last month sleeping and said any activities caused severe exacerbations. (*Id.*) Dr. Fedje-Johnston increased Plaintiff's Oxycontin but decreased his Percocet. (*Id.*) One month later, Plaintiff was continuously using Percocet for breakthrough pain and felt fatigued, run down and depressed. (Tr. 985.) He reported significant financial and relationship issues. (*Id.*) On examination, his neck range of motion was somewhat limited secondary to pain and upper extremities were normal. (*Id.*) On May 2, 2008, Plaintiff told Dr. Fedje-Johnston he suffered hand numbness after doing a brake job on a truck, but he did not have an increase in neck symptoms. (Tr. 983.) Later in May, Plaintiff said his pain was under fair control and he did not want to change his medications. (Tr. 982.)

Dr. Fedje-Johnston replied to a letter from Plaintiff's attorney on June 15, 2008, and opined that cervical fusion offered real potential to improve Plaintiff's life. (Tr. 947.) He stated:

> In dealing with [Plaintiff] over the last several years, it has become apparent that his present level of function is quite unacceptable to him. He continues on daily narcotics, his activities are profoundly limited, and his mental health has suffered significantly. It was for these reasons that he was referred to Dr. Dykes for consideration of cervical fusion surgery.

(*Id.*)

Plaintiff's disability period began on June 15, 2008, and he had surgery in October 2008. (Tr. 686, 999-1001.) Ultimately, one level of his fusion did not join, and he had a

second surgery in May 2010. (Tr. 1347, 1251-53.) He met all physical therapy goals before discharge from the hospital. (Tr. 1252.) The following medical records lead up to the date the ALJ found that Plaintiff was no longer disabled, August 12, 2010.

Plaintiff underwent another independent medical examination with Dr. Terry Hood on March 31, 2010, in connection with his request for workers' compensation to approve a second neck surgery. (Tr. 1243-48.) On examination, Plaintiff had neck tenderness and mild to moderate limitation in his neck range of motion. (Tr. 1247.) Dr. Hood diagnosed mechanical neck pain, mild degenerative changes of the cervical spine, myofascial pain, status post discectomy and fusion with solid unions at C3-4 and C4-5 but nonunion at C5-6. (Tr. 1248.) Dr. Hood opined that if Plaintiff believed his pain was sufficiently severe, he was a candidate for posterior fusion. (*Id.*) Dr. Hood added that three or four months after surgery, Plaintiff should be off narcotics. (*Id.*)

Plaintiff had a posterior spinal fusion of C3-C6 on May 11, 2010, and was discharged from the hospital on May 15, 2010. (Tr. 1251-53.) While in the hospital, Plaintiff was noted to have a very high tolerance to narcotics after a likely episode of aspiration pneumonia,[6] probably caused by over sedation with a similar narcotic regimen that he used at home. (Tr. 1258-59.) Plaintiff was encouraged to taper narcotics after recovery from surgery. (Tr. 1262.) In follow-up on May 31, 2010, there was no evidence of neurologic disease but Plaintiff still complained of pain. (Tr. 1308-09.) In June 2010, Plaintiff said his pain increased when he helped his son with the lawnmower. (Tr. 1303.) He became more

---

[6] Aspiration pneumonia is inflammation of the lungs and airways to the lungs from breathing in foreign material. Risk factors include being less alert due to medication. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001179/

careful about his activities, and his pain was under fair control. (Tr. 1303.) Plaintiff walked frequently, at Dr. Dykes' recommendation. (*Id.*) He discontinued Lyrica because it was causing fatigue. (*Id.*) In July 2010, Plaintiff was still wearing his cervical collar and said his pain was improving, and he was overall better. (Tr. 1300.) He did not want to change his medications but wanted to start physical therapy. (*Id.*) Plaintiff felt he could increase his activity level. (Tr. 1300.) He was not having significant side effects from medication. (*Id.*) On examination, he was in mild pain. (Tr. 1301.) Dr. Fedje-Johnston planned to decrease Plaintiff's medications the next month. (*Id.*)

### C.  The Administrative Hearing

At the hearing before the ALJ on September 15, 2010, Plaintiff testified as follows. He lived in a trailer house, and his twelve-year-old son lived with him part-time. (Tr. 1368.) Plaintiff graduated high school and was divorced, with only one child under the age of eighteen. (*Id.*) Plaintiff had three-level cervical fusion and still had neck pain. (*Id.*) His medications included Oxycontin, Percocet, Klonopin, Wellbutrin, Zanaflex[7] and Maxalt.[8] (Tr. 1369.)

Plaintiff did light housework and cooked on occasion. (Tr. 1370.) He watched television about six hours a day. (*Id.*) He read for about an hour a week. (Tr. 1371.) He visited his brother once a month and went to the movies once every three months. (*Id.*) Plaintiff used to do a lot of fishing, but only fished twice the past spring. (*Id.*) He had not

---

[6] Zanaflex, generically called tizanidine, is a skeletal muscle relaxant that works by slowing the action in the brain and nervous system to allow the muscles to relax. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000106/

[7] Maxalt, generically called rizatriptan benzoate, is indicated for the acute treatment of migraine attacks. *Physician's Desk Reference* 2078 (59th ed. 2005).

hunted in four years. (*Id.*) His son took care of their yard work. (Tr. 1372.)

Plaintiff could walk or stand for fifteen to thirty minutes. (Tr. 1374.) He could only lift eight to ten pounds, because lifting pulled on his shoulders and caused pain. (*Id.*) Plaintiff could sit for 30 to 45 minutes before he would have to lie down and rest his neck. (Tr. 1374-75.) He had poor memory, especially with reading. (Tr. 1375.) Plaintiff took Prilosec because his other medications upset his stomach. (Tr. 1377.) He believed his memory loss was related to his medications. (Tr. 1378.) He had trouble sleeping due to pain and worry, and he was treated with Klonopin. (*Id.*) Plaintiff had headaches about three times a week, which were treated with Maxalt. (Tr. 1379.)

Dr. Andrew Steiner testified at the hearing as a medical expert. (Tr. 1380-82.) He testified that Plaintiff's surgeries would equal Listing 1.04A from October 16, 2008 through August 11, 2010, which was three months after his second surgery. (Tr. 1381.) For all other times, Dr. Steiner testified Plaintiff would have the residual functional capacity for sedentary work with no overhead work, and no work around hazardous machinery. (Tr. 1382.) Dr. Steiner did not take Plaintiff's mental impairments into account. (*Id.*)

Kenneth Ogren then testified as a vocational expert. (Tr. 1383-85.) He testified that if Plaintiff was limited to sedentary work, he could not perform his past relevant work. (Tr. 1383.) The ALJ then posed a hypothetical question about work that could be performed by a 45-year-old high school graduate, with work experience as a laborer; who is impaired by chronic pain status post cervical fusions and some depression; who takes medication; who is limited to lifting and carrying ten pounds, standing or walking two hours out of an eight-hour day, sitting for six hours out of an eight-hour day; who is limited in ability to climb ladders, ropes and scaffolds and be around hazards, and no overhead work; and who is

12

limited to frequent superficial contact with the public and coworkers, and simple, unskilled work with minimum quotas and limited noise exposure. (Tr. 1383-84.) Ogren testified such a person could perform jobs found in the Dictionary of Occupational Titles, such as a polisher, DOT Code 713.684-038, with 2,600 jobs in Minnesota; and an inspector, DOT Code 685.687-014, with 2,400 such jobs in Minnesota. (Tr. 1384.) If Dr. Huber's RFC opinion was accepted in full, there would be no jobs such a person could perform. (Tr. 1384-85.)

D.    **The ALJ's Decision**

On January 3, 2011, the ALJ issued his decision denying Plaintiff's applications for DIB and SSI. (Tr. 682-94.) The ALJ followed the five-step sequential evaluation set forth in the agency's regulations. *See* 20 C.F.R. §§ 404.1520, 416.920. The Eighth Circuit Court of Appeals has summarized these steps as follows: (1) whether the claimant is currently engaged in "substantial gainful activity"; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education and work experience)"; (4) "whether the claimant has the residual functional capacity ("RFC") to perform his or her relevant past work"; and (5) if the ALJ finds that the claimant is unable to perform his or her past relevant work, then the burden is on the ALJ "to prove that there are other jobs in the national economy that the claimant can perform." Fines v. Apfel, 149 F.3d 893, 894-95 (8th Cir. 1998).

At the first step of the evaluation process, the ALJ determined that the claimant had not engaged in substantial gainful activity since July 25, 2006, the alleged onset date. (Tr.

686.)  At the second step of the process, the ALJ found that Plaintiff had severe impairments of cervical degenerative disc disease with chronic pain, and depression with anxiety symptoms.  (*Id.*)

At the third step of the evaluation, the ALJ determined that Plaintiff equaled the criteria of section 1.04A, 20 C.F.R. Part 404, Subpart P, Appendix 1, from June 15, 2008 through August 11, 2010.  (*Id.*)  In making this finding, the ALJ relied on the medical expert's testimony and Dr. Fedje-Johnston's correspondence stating that Plaintiff was profoundly affected by his neck pain.  (*Id.*)  The ALJ also took into account the workers' compensation court findings that surgical intervention was justified.  (*Id.*)  Thus, the ALJ found Plaintiff was under a disability from June 15, 2008 through August 11, 2008.  (Tr. 687.)  However, Plaintiff did not meet or equal a listing before June 15, 2008.  (*Id.*)  Also based on the medical expert's testimony, the ALJ found medical improvement as of August 12, 2010, and Plaintiff no longer met or equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 687-88.)

At the next step of the evaluation process, the ALJ determined that prior to June 15, 2008 and beginning on August 12, 2010, Plaintiff had the residual functional capacity to perform sedentary work requiring only occasional lifting and carrying of ten pounds; standing and walking two hours out of an eight-hour day; sitting six hours out of an eight-hour day; no climbing ladders, ropes or scaffolds; no exposure to hazards; no overhead work; brief and superficial contact with coworkers and the public; limited to simple, unskilled work with limited quotas and noise exposure.  (Tr. 688-89.)  The ALJ gave the following reasons for his conclusion.  Dr. Steiner's opinion was afforded great weight due to his expertise in rehabilitation medicine, his ability to review the entire record, and consistency

of his opinion with the record as a whole.  (Tr. 689.)  The ALJ found Dr. Fedje-Johnston's statement that Plaintiff had profound limits in daily functioning was not supported by the type of clinical and laboratory findings one would expect to find with disability prior to June 15, 2008.  (Tr. 690.)  Clinical findings were some limitation in neck range of motion and tenderness on examination, but otherwise examinations were normal.  (*Id.*)  An MRI done in August 2005 showed mild to moderate disc degeneration from C3-C6.  (*Id.*)  An updated MRI in 2007 showed similar findings but with increased degeneration.  (*Id.*)  This was when surgical intervention was recommended, and it was performed on October 16, 2008, after Plaintiff was given an opportunity to quit smoking because smoking increased the possibility of nonunion.  (*Id.*)

The ALJ gave great weight to the opinions of Dr. Terry Hood, who performed independent medical examinations of Plaintiff in November 2007 and again in March 2010. (Tr. 690-91.)  The ALJ found the opinions were supported by the medical record.  (Tr. 691.) After Plaintiff's posterior spinal fusion on May 11, 2010, he reported marked improvement over the next months.  (*Id.*)

The ALJ also considered the 2006 opinion of Dr. Huber and the December 2007 opinion of Dr. Toonstra, and granted their opinions great weight based on consistency with the record.  (Tr. 691-92.)  Specifically, the ALJ noted Plaintiff's depression improved with medication and with the overall improvement in his physical condition.  (Tr. 692.)  Plaintiff reported improvement from use of Wellbutrin.  (*Id.*)  The ALJ considered Plaintiff's daily activities, finding he was quite functional in June 2007; he went on a two-day fishing trip in early July 2008; in May 2008, he installed brakes on a vehicle; and Plaintiff told Dr. Toonstra that he took his son to sporting events and practices.  (*Id.*)  The ALJ found that

Plaintiff had a work history consistent with full-time employment for a number of years, but this was not enough to overcome the absence of objective evidence of disability. (*Id.*)

Based on the VE's testimony, the ALJ concluded Plaintiff was not capable of performing his past relevant work prior to June 15, 2008 and beginning on August 12, 2010. (Tr. 692-93.) The ALJ also relied on the VE's testimony in concluding there was other work in the national economy that Plaintiff could perform prior to June 15, 2008 and beginning on August 12, 2010, including polisher and inspector. (Tr. 693-94.) The ALJ concluded that Plaintiff's disability ended on August 12, 2010. (Tr. 694.)

## II.    DISCUSSION

### A.    Standard of Review

Review by this Court is limited to a determination of whether a decision of the ALJ is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Davidson v. Astrue*, 578 F.3d 838, 841 (8th Cir. 2009). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brace v. Astrue*, 578 F.3d 882, 884 (8th Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted)). "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis." *Id.*

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). The

Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213 (if supported by substantial evidence, the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding.) Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." *Gavin*, 811 F.2d at 1199.

The claimant bears the burden of proving his or her entitlement to disability benefits. *See* 20 C.F.R. § 404.1512(a); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated he or she can not perform past work due to a disability, the burden of proof shifts to the Commissioner to show that the claimant can engage in some other substantial gainful activity. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).

### B.    Analysis

Plaintiff contends the ALJ erred by adopting Dr. Steiner's medical opinion, in part because the opinion was limited to Dr. Steiner's consideration of the objective physical evidence. Plaintiff asserts the ALJ should have instead adopted the treating physicians' opinions, and that Drs. Fedje-Johnston, Eckman and Dykes found Plaintiff's symptoms consistent with their examination findings. Plaintiff also contends that although the ALJ stated he placed great weight on Drs. Huber and Toonstra's psychological opinions, he actually rejected their opinions because they opined Plaintiff's pain made him incapable of full-time work. Plaintiff states his GAF score of 45 indicates an extreme inability to engage in work.

The Commissioner points out that the ALJ found Plaintiff disabled in June 2008

based on Dr. Fedje-Johnston's letter indicating Plaintiff was profoundly affected by his neck pain. Contrary to Plaintiff's assertion, the Commissioner contends Dr. Steiner never stated that he did not take Plaintiff's subjective complaints into account. Moreover, the Commissioner contends it was proper for the ALJ to rely on a physician's opinion that was based on the objective evidence, if the ALJ discussed the claimant's subjective complaints elsewhere in the decision. The Commissioner also asserts the ALJ reasonably limited his reliance on Dr. Steiner's opinion to physical impairments, because Dr. Steiner was a specialist in physical medicine, not psychology.

In response to Plaintiff's contention that every treating physician's opinion was contrary to Dr. Steiner's opinion, the Commissioner responds that Dr. Fedje-Johnston's treatment notes do not support disability before June 2008 because:  1) in September 2006, Plaintiff reported fair relief from pain medications; 2) in December 2006, Plaintiff's pain was improved with no significant side effects; 3) in December 2006, Plaintiff reported that overall his medications were working quite well; 4) in March 2007, Plaintiff was back in school and reported doing fairly well, although he dropped some classes due to fatigue; 5) in October 2007, Plaintiff reported fair control of his pain; 6) in January 2008, Plaintiff said he was doing fairly well; in contrast to his report in February 2008 that his pain had been worsening over the past months; 7) in March 2008, Dr. Fedje-Johnston noted Plaintiff's pain medication helped; 8) in May 2008, Plaintiff did a brake job on a truck without increasing his neck symptoms; and 9) later in May 2008, Dr. Fedje-Johnston noted Plaintiff's pain was under fair control, and his medications worked quite well for him. The Commissioner also asserts this evidence is contrary to Dr. Eckman's September 2006 opinion that Plaintiff was permanently and totally disabled. Additionally, Dr. Dykes never

gave a residual functional capacity opinion, and Dr. Hood did not believe the 2008 surgery was necessary. Finally, the Commissioner asserts Dr. Fedje-Johnston's treatment records show Plaintiff improved after the 2010 surgery.

The Commissioner also addressed the ALJ's analysis of Plaintiff's mental impairments, arguing that the ALJ reasonably analyzed Drs. Huber and Toonstra's opinions and gave most of their opinions great weight, without adopting their entire opinions. The Commissioner asserts the ALJ properly considered other evidence in arriving at his mental RFC opinion, including Plaintiff's lack of psychiatric treatment, normal mental status examinations, ability to perform a wide array of activities, state agency reviewing physicians' opinions, Plaintiff's improvement on medication, and Plaintiff's GAF scores of 55 during the relevant time frame, as opposed to his GAF score of 45 during the period of disability.

A claimant's residual functional capacity is what he can do despite his physical or mental impairments. *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003). "The ALJ should consider 'all the evidence in the record' in determining RFC, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *Stormo v. Barnhart*, 377 F.3 801, 807 (8th Cir. 2004) (quoting *Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002) (citing *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)). The RFC determination must be based on medical evidence that addresses the claimant's ability to function in the workplace. *Id.* The mere existence of a medically documented impairment does not necessarily result in a finding of disability. (*Id.*) "If, in light of all the evidence, 'the impairments are not severe enough to limit significantly the claimant's ability to perform most jobs, by definition the impairment does not prevent

the claimant from engaging in any substantial gainful activity.'" *Id.* (quoting *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987)).

A treating physician's RFC opinion should be given controlling weight if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record." *Ellis v. Barnhart*, 392 F.3d 988, 995 (8th Cir. 2005) (quoting *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (quotation omitted)). An ALJ can discount a treating physician's opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001). If the ALJ does not give the treating physician's opinion controlling weight, she should consider the following factors in weighing the medical opinions: 1) type of relationship with physician; 2) supportability of the opinion; 3) consistency of the opinion with the record as a whole; 4) specialization; and 5) any factors brought to the ALJ's attention. *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)). "The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole." *Id.* at 848 (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)).

Analyzing the credibility of the claimant's subjective complaints is a component of the RFC determination. *Ellis*, 392 F.3d at 995-96. The ALJ should apply the following credibility factors: 1) daily activities; 2) duration, frequency and intensity of pain; 3) precipitating and aggravating factors; 4) dosage, effectiveness and side effects of medication; and 5) functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ may not discount a claimant's credibility solely because the objective

evidence does not fully support his subjective complaints, but may discount credibility based on inconsistencies in the record as a whole. *Ellis*, 392 F.3d at 996.

### 1. Physical RFC Determination

Dr. Steiner did not testify that his opinion was limited to objective physical evidence but only that it was limited to physical not mental impairments. (Tr. 1380-82.) This was appropriate given that Dr. Steiner was a specialist in physical rehabilitation, not psychology. Plaintiff asserts Drs. Dykes, Eckman and Fedje-Johnston expressed opinions that Plaintiff could not sustain full-time competitive employment due to pain and spinal disease, but Plaintiff has not pointed to specific functional limitations given by a treating physician after the alleged disability onset date. Medical source opinions that a claimant is unable to work are not given controlling weight because the issue of disability is reserved to the Commissioner. *Ellis*, 392 F.3d at 994.

On August 30, 2007, Dr. Fedje-Johnston stated Plaintiff was "quite limited in what he does" and could not work due to pain and inability to stand for long periods. (Tr. 1186.) The ALJ accommodated the inability to stand for long periods by limiting Plaintiff to sedentary work, and Dr. Fedje-Johnston did not describe any other specific work restrictions. Furthermore, Dr. Fedje-Johnston's consistent clinical findings of cervical tenderness on palpation, pain with neck range of motion, and normal upper extremities do not support physical work restrictions beyond the limited sedentary RFC assessed by the ALJ. Regarding Dr. Eckman's opinion, upon examining Plaintiff in August 2006 he noted there was no evidence of radiculopathy or myelopathy, but he opined Plaintiff was permanently and totally disabled. An ALJ may discount a physician's opinion if it is based on discredited subjective complaints. *Gaddis v. Chater*, 76 F.3d. 893, 895-96 (8th Cir.

1996). For the reasons discussed below, the ALJ properly discredited the severity of Plaintiff's subjective complaints.

In addition to crediting Dr. Steiner's opinion, the ALJ gave great weight to Dr. Hood's opinions as consistent with the record as a whole. Drs. Steiner and Hood's opinions are consistent with the minor findings in clinical examinations and mild to moderate findings of degenerative discs on MRI. In September 2007, Dr. Hood opined that Plaintiff embellished his symptoms, and the mechanism of Plaintiff's injury did not explain his development of discogenic pain at three levels of the cervical spine. (Tr. 1240.) Dr. Hood described Plaintiff's impairments as mechanical neck and muscle pain with mild degenerative disc disease. (Tr. 1248.) Additionally, Dr. Hood did not believe the discogram results were valid because pain was indicated at the level of C4-5, but the 2007 MRI was normal at that level. (Tr. 1241.) If C4-5 was injured in 2002, Dr. Hood would have expected to see degenerative changes. (*Id.*) Although Dr. Hood did not give an RFC opinion, his evaluation supports the ALJ's decision to discount the treating physicians' opinions.

The ALJ, however, cannot discount Plaintiff's subjective complaints based solely on the lack of objective evidence supporting the severity of his symptoms. The ALJ must also evaluate Plaintiff's credibility based on the record as a whole, taking into account the *Polaski* factors. The record indicates Plaintiff's treating physicians accepted his subjective complaints as true and treated him accordingly, exhausting other remedies before resorting to surgery. During the relevant time, Plaintiff was primarily treated for pain with narcotic pain medications. Although the medications did not eliminate Plaintiff's pain, Dr. Fedje-Johnston noted the medications reduced Plaintiff's pain. (Tr. 982, 1192, 1194, 1300, 1303.) Plaintiff reported that when he "takes it easy," his pain level was three or four on a

scale of one to ten. (Tr. 920.) Presumably, a physician would not continuously prescribe Oxycontin and Percocet for years if the medications were ineffective. "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." *Bannister*, 730 F.Supp. 2d 946, 955 (S.D. Iowa 2010) (quoting *Shultz v. Astrue,* 479 F.3d 979, 983 (8th Cir. 2007) (quotation omitted)). The record also indicates that when Plaintiff complained of side effects, Dr. Fedje-Johnston adjusted Plaintiff's medications to relieve the side effects. (Tr. 920, 1303.)

The ALJ also discounted Plaintiff's subjective complaints due to inconsistency with some of his activities. Plaintiff did light housework, visited his girlfriend or a neighbor weekly, and took his son to sports events and practices. (Tr. 921, 922, 927.) Just before the period of disability, Plaintiff did a brake job on a truck without increasing his neck pain. (Tr. 983.) Plaintiff testified his pain was so severe he had to lie in bed for hours every day. (Tr. 921.) The effectiveness of his pain medication and his other activities are not consistent with this assertion.

The ALJ gave Plaintiff's subjective complaints some weight because he found the disability period began four months before Plaintiff's first surgery, and he restricted Plaintiff to a limited range of sedentary work outside the disability period. Dr. Fedje-Johnston's treatment note of July 2010 supports the ALJ's finding that disability ended three months after Plaintiff's second surgery, because Plaintiff was improved overall and was ready to increase his activities. "While pain may be disabling if it precludes a claimant from engaging in any form of substantial gainful activity, the mere fact that working may cause pain or discomfort does not mandate a finding of disability." *Perkins v. Astrue*, 648 F.3d 892, 900 (8th Cir. 2011) (quoting *Jones v. Chater*, 86 F.3d 823, 826 (8th Cir. 1996)).

Although not cited by the ALJ, chronic use of narcotic pain medication can be a negative credibility factor if the record indicates addiction could have influenced the severity of a claimant's complaints. *Ellis*, 292 F.3d at 996; *see also Perkins v. Astrue*, 648 F.3d 892, 899 (8th Cir. 2011) (noting additional evidence in the record supporting the ALJ's decision, beyond the reasons cited by the ALJ). In September 2007, after Plaintiff had been treated daily with narcotics since 2002, Dr. Hood opined Plaintiff should be in a chronic pain program to wean off narcotics. (Tr. 1242.) In 2010, Dr. Hood believed Plaintiff should have a second fusion surgery for nonunion if he felt his pain was severe, but that he should be weaned off narcotics three months after surgery. (Tr. 1248.) Plaintiff had a high tolerance for narcotics, requiring higher doses of pain medication and leading to a probable episode of aspiration pneumonia while hospitalized for his second surgery in May 2010. (Tr. 1258, 1262.) It was then recommended that he wean off narcotics after recovery from surgery. (*Id.*) Even though Plaintiff said his pain was improved and he wanted to increase his activity in July 2010, he did not want to change his medications. (Tr. 1300.)

For all these reasons, the ALJ properly discounted the severity of Plaintiff's subjective complaints and adopted the physical RFC opinion of Dr. Steiner, with disability beginning June 15, 2008 based on Dr. Fedje-Johnston's opinion that surgery was a reasonable option, and concluding three months after Plaintiff's second surgery. The record as a whole supports Dr. Steiner's opinion that Plaintiff was physically capable of a limited range of sedentary work outside the disability period. This does not end the analysis because Plaintiff contends he was further limited by his mental impairments.

### 2. Mental RFC Determination

Plaintiff asserts that although the ALJ said he gave great weight to Drs. Huber and Toonstra's opinions, he actually rejected their opinions. The record indicates the ALJ accepted some but not all of Drs. Huber and Toonstra's opinions because their work restrictions were based on Plaintiff's subjective reports of pain, and the ALJ discounted Plaintiff's subjective pain complaints. *See Nicolls v. Astrue*, No. C11-4065-LTS, 2012 WL 2855869 at *15 (N.D. Iowa 2012) ("The RFC must only include those impairments which are substantially supported by the record as a whole") (quoting *Goose v. Apfel*, 238 F.3d 981, 985 (8th Cir. 2001) (citation omitted); *Id.* ("[N]othing requires the ALJ to provide reasons for failing to adopt certain limitations identified by the state agency consultants . . .")

In October 2006, Dr. Huber opined that psychologically, Plaintiff could carry out tasks with reasonable persistence and pace but he was markedly compromised by chronic pain, and without pain, he could tolerate stress in the workplace. (*Id.*) In other words, if Plaintiff's severe pain complaints were not credited, Dr. Huber's opinion of Plaintiff's ability to work would change. The only clinical finding by Dr. Huber was Plaintiff's difficulty recalling four items from a list. Plaintiff displayed no cognitive deficits on mental status examination with Dr. Toonstra in December 2007. Dr. Toonstra stated: "[Plaintiff] would not appear to have difficulty carrying out work-like tasks with reasonable persistence or pace if he were not in pain" and " [h]e would likely be able to tolerate stress and pressure in entry-level work places if he were able to manage his pain issues." Thus, Dr. Toonstra's opinion of Plaintiff's work restrictions was also based on Plaintiff's subjective pain complaints. However, the ALJ discounted Plaintiff's subjective complaints because there was evidence in the record that Plaintiff could manage his pain and mental impairments

with medication.

Drs. Toonstra and Huber assessed Plaintiff with a GAF score of 55, solidly in the moderate range of limitations from mental impairment. Plaintiff was assessed a GAF score of 45 only during his period of disability. (Tr. 1025.) The ALJ limited Plaintiff to brief and superficial contact with coworkers and the public, and simple, unskilled work with limited quotas and noise exposure. Thus, the ALJ accommodated Plaintiff's medication side effect of irritability, his reduced attention and concentration and difficulty with work stress. The ALJ gave good reasons for discounting the severity of Plaintiff's subjective complaints, and the evidence as a whole supports the ALJ's mental RFC finding, which represents moderate as opposed to severe work limitations from depression and anxiety caused by pain.

III.    **CONCLUSION**

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED THAT:**

1.    Plaintiff's Motion for Summary Judgment [Docket No. 8] be **DENIED**;

2.    Defendant's Motion for Summary Judgment [Docket No. 14] be **GRANTED;**

3.    If this Report and Recommendation is adopted, that judgment be entered accordingly.

Dated: September 12, 2012            ___s/ Arthur J. Boylan_____
                                     ARTHUR J. BOYLAN
                                     United States Chief Magistrate Judge


Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which

specifically identify the portions of the Report to which objections are made and the bases for each objection. This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before September 26, 2012.